1  John J. Nelson (SBN 317598)
2  **MILBERG COLEMAN BRYSON**
   **PHILLIPS GROSSMAN, PLLC**
3  280 S. Beverly Drive-Penthouse Suite
4  Beverly Hills, CA 90212
   Telephone: (858) 209-6941
5  Email: jnelson@milberg.com
   *Attorneys for Plaintiff and Proposed Class*
6

7

8  **IN THE DISTRICT COURT FOR**
   **THE NORTHERN DISTRICT OF CALIFORNIA**
9  **SAN FRANCISCO**

10

11 **CELESTE JONES**, on behalf of herself
   and all similarly situated individuals,        Case No.:_____
12
13                          Plaintiff,            **CLASS ACTION COMPLAINT**
   v.
14                                                 1. **Negligence**
15 **TEA DATING ADVICE INC.**,                     2. **Negligence** *Per Se*
                                                   3. **Breach of Implied Contract**
16                          Defendants.            4. **Unjust Enrichment**
                                                   5. **Declaratory Judgment**
17
18                                                      **JURY TRIAL DEMANDED**
19

20        Plaintiff Celeste Jones ("Plaintiff"), individually and on behalf of all other

21 similarly situated individuals (the "Class" or "Class Members," as defined below),

22 by and through her undersigned counsel, files this Class Action Complaint against

23 **Tea Dating Advice Inc.** ( "Tea" or "Defendant") and alleges the following based

24 on personal knowledge of facts, upon information and belief, and based on the

25 investigation of her counsel as to all other matters.

26                          **I.    INTRODUCTION**

27        1.    Plaintiff brings this class action lawsuit against Tea for its failure to

28                          CLASS ACTION COMPLAINT - 1

protect and safeguard Plaintiff's and the Class's highly sensitive private information.[1] As a result of Tea's insufficient data security, cybercriminals easily infiltrated Defendant's inadequately protected network and accessed the private information of Plaintiff and the Class (the "Data Breach" or "Breach").[2] Now, Plaintiff's and the Class's private information is in the hands of cybercriminals who will undoubtedly use their PII for nefarious purposes for the rest of their lives.

2.    "Founded in 2023, Tea allows women to anonymously review and share details about the men they have dated. Intended to alert women about potential red or green flags in their vicinity, the app had surged to the top of App Store ratings recently."[3]

3.    "Women who sign up and are approved can join an anonymous forum to seek feedback on men they are interested in, or report bad behavior from men they have dated. Other tools on the app allow users to run background checks, search for criminal records and reverse image search for photos in the hope of spotting "catfishing," where people pass off photos of others as themselves."[4]

4.    "On July 25, 2025, Tea announced there had been a data breach of a "legacy storage system" holding data for its users."[5]

5.    Specifically, Tea issued the following statement:

---

[1]https://oag.ca.gov/ecrime/databreach/reports/sb24-602341 (containing a link to the notice of data breach letters Defendant is in the process of issuing to victims of the Data Breach).

[2] *Id.*

[3] https://www.pcmag.com/news/tea-app-data-leak-worsens-sensitive-chats-up-until-last-week-exposed.

[4] https://www.nytimes.com/2025/07/26/us/tea-safety-dating-app-hack.html.

[5] *Id.*

CLASS ACTION COMPLAINT - 2

## OFFICIAL STATEMENT

At 6:44 AM PST on 7/25, we identified unauthorized access to our systems and immediately launched a full investigation with assistance from external cybersecurity experts to understand the scope and impact of the incident. Here's what we know at this time:

A legacy data storage system was compromised, resulting in unauthorized access to a dataset from prior to February 2024. This dataset includes approximately 72,000 images, including approximately 13,000 selfies and photo identification submitted by users during account verification and approximately 59,000 images publicly viewable in the app from posts, comments and direct messages.

No email addresses or phone numbers were accessed. Only users who signed up before February 2024 were affected.

This information was stored in accordance with law enforcement requirements related to cyber-bullying investigations.

We are working around the clock with internal security teams and third-party experts to secure our systems. We are currently working to determine the full nature and scope of information involved in the incident.

We will continue to share updates as more information becomes available. In the meantime, if you have questions or concerns, please contact our support team at support@teaforwomen.com.

Your data privacy is of the utmost importance to us. We are taking all necessary measures to strengthen our security posture and ensure that no further data is exposed. Thank you for your trust—and for your patience as we address this with the urgency it deserves[.][6]

6.    After Tea's initial announcement, the Data Breach has only continued

---

[6]https://www.teaforwomen.com/cyberincident?fbclid=PAZXh0bgNhZW0CMTEAAacvSS9fDr3j_V6qsgtWC-I67xkR2r1hfuIpN7g6IPgk3xvW9E7F-ejwsh4P3w_aem_iovnAL9qmrUcfMQlXw6B0w.

to get worse. Tea issued an update on or around July 29, 2025, stating the following:

### UPDATE REGARDING CYBERSECURITY INCIDENT

Sharing an update on the cyber incident that took place last week. As part of our ongoing investigation, we have recently learned that some direct messages (DMs) were accessed as part of the initial incident. For this reason our DM functionality is down.

To address the issue and out of an abundance of caution, we have taken the affected system offline altogether. At this time, we have found no evidence of access to other parts of our environment.

Please know that we're committed to keeping you informed as quickly as possible. That said, because this is an active investigation involving external cybersecurity experts and the FBI, there are limits to what we can share—and when. We'll continue to provide updates as soon as we have confirmed information and are able to do so responsibly.

Our team remains fully engaged in strengthening the Tea App's security, and we look forward to sharing more about those enhancements soon. In the meantime, we are working to identify any users whose personal information was involved and will be offering free identity protection services to those individuals[.]

7.     "The exposed data contains messages between users discussing abortions, cheating partners, and even phone numbers they sent to each other[,]"[7] as well as "[i]mages from posts, comments and direct messages in the apps"[8] (collectively, "Private Information").

8.     "What makes matters worse is that these chats mentioned social media handles, phone numbers, and real names. A little research could actually reveal the

---

[7] https://www.pcmag.com/news/tea-app-data-leak-worsens-sensitive-chats-up-until-last-week-exposed.

[8] https://www.nytimes.com/2025/07/26/us/tea-safety-dating-app-hack.html.

identities of people mentioned."[9]

9.     This Breach is particularly egregious because Tea touts itself as a "secure, anonymous platform." Now, numerous women who shared highly confidential information have been exposed. The Data Breach demonstrates Tea was not secure or anonymous.

10.    To date, Defendant has provided very little information regarding how the Data Breach occurred or exactly what Private Information was impacted.

11.    Upon information and belief, Plaintiff is a victim of the Data Breach as one of Defendant's users.

12.    Defendant collected Plaintiff and the Class's Private Information for business purposes—specifically for use of the Tea mobile application. At all relevant times, Defendant knew or should have known that Plaintiff's and Class Member's sensitive data, including their highly confidential  Private Information would be stored on Defendant's networks and should be stored with the utmost care.

13.    By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties to Plaintiff and the Class. These duties arose from state and federal statutes and regulations as well as common law principles.

14.    Defendant disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly and/or negligently failing to take and implement adequate and reasonable measures to ensure that Plaintiff's and Class Members' Private Information was safeguarded, failing to take available steps to prevent an unauthorized disclosure of Private Information and failing to follow applicable, required and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use. As a result, the Private Information of Plaintiff and

---

[9] https://www.pcmag.com/news/tea-app-data-leak-worsens-sensitive-chats-up-until-last-week-exposed.

Class Members was compromised through disclosure to an unknown and unauthorized third party—an undoubtedly nefarious third party that seeks to profit off this disclosure by defrauding Plaintiff and Class Members in the future.

15.    Due to Tea's failure to secure and protect Plaintiff's and Class Members' Private Information, cybercriminals have stolen and obtained everything they need to commit identity theft and wreak havoc on the financial and personal lives of what is estimated to be millions of individuals.

16.    Now, and for the rest of their lives, Plaintiff and the Class Members will have to deal with the danger of identity thieves and fraudsters possessing and misusing their Private Information. Class Members will have to spend time responding to the Data Breach and are at an immediate and heightened risk of all manners of identity theft, fraud, and potentially severe social ramifications as a direct and proximate result of the Data Breach.

17.    Plaintiff and Class Members have incurred and will continue to incur damages in the form of, among other things, identity theft, attempted identity theft, lost time and expenses mitigating harms, increased risk of harm, loss of privacy, and additional damages as described below.

18.    Plaintiff and Class Members have a continuing interest in ensuring that their Private Information is and remains safe, and they are entitled to injunctive and other equitable relief.

19.    Plaintiff brings this action individually and on behalf of the Class, seeking compensatory damages, punitive damages, nominal damages, restitution, injunctive and declaratory relief, reasonable attorneys' fees and costs, and all other remedies this Court deems just and proper.

## II.    **THE PARTIES**

20.    Plaintiff **Celeste Jones** is an individual domiciled in Newark, New

Jersey. Plaintiff Jones used Tea's mobile application and was a registered user prior to February 2024. Upon information and belief, Plaintiff Jones's Private Information was compromised in the Data Breach.

21.    Defendant **Tea Dating Advice Inc.** is a Delaware corporation with its principal place of business located at 201 Spear Street, Suite 1100, San Francisco, California 94105. Tea's registered agents are Jesse Camarena, Sandra Menjivar, Arielle Devay, and Angie Ramirez, who can be served at 500 N. Brand Blvd., Suite 890, Glendale, California.

### III.    JURISDICTION AND VENUE

22.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than one hundred putative Class Members, and minimal diversity exists because many putative Class Members are citizens of a different state than Defendant.

23.    This Court has personal jurisdiction over Defendant because Defendant is registered to do business in the State of California; has its principal place of business in this District; conducts substantial business in this District through its headquarters, offices, and affiliates; engaged in the conduct at issue here in this District; and/or otherwise has substantial contacts with this District and purposely availed itself to the Courts in this District.

24.    Venue is proper in this District under 28 U.S.C. §§ 1391(a)(2), 1391(b)(2), and 1391(c)(2) as a substantial part of the events giving rise to the claims emanated from activities within this District. Upon information and belief, the Data Breach giving rise to this lawsuit occurred in this District.

## IV.   FACTUAL ALLEGATIONS

### A. Tea's Massive and Preventable Data Breach.

20.    Tea is "[a] dating safety app that allows women to do background checks on men and anonymously share 'red flag' behaviour."[10]

21.    "Tea lets women check whether potential partners are married or registered sex offenders as well as run reverse image searches to protect against 'catfishing', where people use fake online identities."[11]

22.    "The premise of Tea is to provide women with a space to report negative interactions they've had while encountering men in the dating pool, with the intention of keeping other women safe."[12]

23.    Tea "blocks screenshots so that posts are not shared outside the app."[13]

24.    The Tea dating app has approximately 1.6 million users, who are all women.[14]

25.    Tea offers various subscription models where users pay to use Tea's app.[15]

26.    However, in order to create an account, users must provide Tea with their location, birth date, photo and ID photo.[16]  Thus, in the ordinary course of business, Tea receives the Private Information of individuals, such as Plaintiff and the Class, through its app users.

27.    Tea obtains, collects, uses, and derives a benefit from the Private Information of Plaintiff and Class Members. Tea uses the Private Information it

---

[10] https://www.bbc.com/news/articles/c7vl57n74pqo.

[11] *Id.*

[12] https://www.cnet.com/tech/services-and-software/the-tea-app-data-breach-what-happened-and-what-was-exposed/.

[13] *Id.*

[14] *Id.*

[15] https://www.teaforwomen.com/terms.

[16] *Id.*

collects to facilitate its app, making a profit therefrom. Tea would not be able to obtain revenue if not for the acceptance and use of Plaintiff's and the Class's Private Information.

28.    By collecting Plaintiff's and the Class's Private Information, Tea assumed legal and equitable duties to Plaintiff and the Class to protect and safeguard their Private Information from unauthorized access and intrusion.

29.    Despite this, Tea failed to adopt reasonable and appropriate data security practices and procedures including administrative, physical security, and technical controls to safeguard Plaintiff's and the Class's Private Information.

30.    As a result, Plaintiff's, and Class Members' Private Information was accessed and stolen from Tea's inadequately secured systems in a massive and preventable Data Breach.

31.    "Tea has said about 72,000 images were leaked online in the initial incident, including 13,000 images of selfies or selfies featuring a photo identification that users submitted during account verification. Another 59,000 images publicly viewable in the app from posts, comments and direct messages were also accessed without authorization…."[17]

32.    Due to the Breach thousands of women's highly confidential messages, pictures of their driver's licenses (or other identification), photos, and profile activity on the Tea app was disclosed to the public.

33.    This Data Breach poses a huge safety risk to Plaintiff and the Class. Particularly because Tea is supposed to be an anonymous and safe space for women to report abusive men and cheating partners.

34.    "Because of the nature of the app—which allows women to anonymously discuss sensitive information about the men they date—users may be

---

[17]    https://apnews.com/article/tea-app-dating-women-breach-messages-24c6e3ca6e8256f0594f80588607ba11.

particularly vulnerable to malicious actors who try to expose their real-life identities."[18]

35.   Tea has yet to issue notice of data breach letters to the victims, opting to post images on its social media, as pictured below:



**Tea App Users,**

We always want this space to feel transparent, and our community is our first priority. There is a lot of misinformation circulating, so please take a moment to read. Here's what you need to know:

We discovered unauthorized access to an archived data system.
If you signed up for Tea after February 2024, all your data is secure.

This archived system stored about 72,000 user-submitted images –
including approximately 13,000 images of selfies and selfies including photo identification submitted during account verification.
These photos can in no way be linked to posts within Tea.

Additionally, 59,000 images publicly viewable in the app from posts, comments and direct messages from over two years ago were accessed.
This data was stored to meet law enforcement standards around cyberbullying prevention.

We've acted fast and we're working with some of the most trusted cyber security experts. For more information, please visit the link in our bio.
We're taking every step to protect this community - now and always.
Thank you for your patience and trust.

---

[18]          https://apnews.com/article/tea-app-dating-women-breach-messages-24c6e3ca6e8256f0594f80588607ba11.



36.    All in all, Tea failed to take the necessary precautions required to safeguard and protect Plaintiff's and Class Members' Private Information from unauthorized access and exploitation.

37.    Tea's actions represent a flagrant disregard of the rights of Plaintiff and the Class, both as to privacy and property.

**B. Cybercriminals Will Use Plaintiff's and the Class's Private Information to Defraud Them.**

38.    Private is of great value to hackers and cybercriminals, and the data stolen in the Data Breach can and will be used in a variety of ways by criminals to exploit Plaintiff and the Class Members and to profit from their misfortune.

39.    "Your ID—whether a driver's license, passport, or state ID—is a master key to your identity. Identity cards contain enough information for someone to steal your identity, access your bank and other accounts, or even forge official documents in your name."[19]

40.    "Your ID contains some of your most sensitive personally identifiable information (PII) — including your full name, date of birth, driver's license number, address, signature, and more."[20]

41.    With a stolen ID, criminals can create a fake ID tied to the victim (meaning debt collectors or government agencies may come after the victim for unpaid funds).[21] A fake ID may also allow criminals to gain illegal employment, access government benefits, or even commit crimes under the victim's name.[22]

42.    Additionally, armed with a fake ID, scammers often trick banks into giving them access to the victim's bank account.[23] This can lead to a lengthy investigation and recovery process, as the bank may argue that it was shown legitimate ID during the interaction.[24]

43.    Scammers can also use stolen IDs to open new accounts in the victim's

---

[19] https://www.aura.com/learn/can-someone-steal-your-identity-with-your-id.
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] *Id.*

CLASS ACTION COMPLAINT - 12

name, including: banks, credit card companies, utility and cell phone providers, and even government agencies.[25]

44.    Each year, identity theft causes tens of billions of dollars of losses to victims in the United States.[26]

45.    Private Information is such a valuable commodity to identity thieves that once it has been compromised, criminals will use it for years.[27]

46.    This was a financially motivated breach, as the only reason the cybercriminals go through the trouble of running targeted cyberattacks against companies like Tea is to get ransom money and/or information that they can monetize by selling on the black market for use in the kinds of criminal activity described herein.

47.    U.S. driver's license numbers sell on average for $150 on the dark web.[28]

48.    "[I]f there is reason to believe that your personal information has been stolen, you should assume that it can end up for sale on the dark web."[29]

---

[25] *Id.*

[26] *Facts + Statistics: Identity Theft and Cybercrime*, INSURANCE INFO. INST., https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (discussing Javelin Strategy & Research's report "2018 Identity Fraud: Fraud Enters a New Era of Complexity").

[27] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO, July 5, 2007, available at https://www.gao.gov/products/gao-07-737.

[28] https://www.aura.com/learn/can-someone-steal-your-identity-with-your-id.

[29] *Dark Web Monitoring: What You Should Know*, CONSUMER FEDERATION OF AMERICA (Mar. 19, 2019), https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/.

49.     These risks are both certainly impending and substantial. As the Federal Trade Commission ("FTC") has reported, if hackers get access to PII, ***they will use it***.[30]

50.     Hackers may not use the information right away, but this does not mean it will not be used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information ***may continue for years***. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[31]

51.     Identity theft victims must spend countless hours and large amounts of money repairing the impact to their credit as well as protecting themselves in the future.[32]

52.     The full scope of the harm has yet to be realized. There may be a time lag between when harm occurs versus when it is discovered, and between when Private Information is stolen and when it is used.

53.     Plaintiff and Class Members will need to pay for their own identity theft protection and credit monitoring for the rest of their lives due to Tea's gross

---

[30] Ari Lazarus, *How fast will identity thieves use stolen info?*, MILITARY CONSUMER (May 24, 2017), https://www.militaryconsumer.gov/blog/how-fast-will-identity-thieves-use-stolen-info.

[31] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown,* GAO (July 5, 2007), available at https://www.gao.gov/products/gao-07-737.

[32] *Guide for Assisting Identity Theft Victims*, FEDERAL TRADE COMMISSION (Sept. 2013), *available at* https://www.global-screeningsolutions.com/Guide-for-Assisting-ID-Theft-Victims.pdf.

1  negligence.

2      54.    Nonetheless, identity monitoring only alerts someone to the fact that

3  they have ***already been the victim of identity theft*** (*i.e.*, fraudulent acquisition and

4  use of another person's PII)—it does not prevent identity theft.[33] Nor can an identity

5  monitoring service remove personal information from the dark web.[34]

6      55.    "The people who trade in stolen personal information [on the dark web]

7  won't cooperate with an identity theft service or anyone else, so it's impossible to

8  get the information removed, stop its sale, or prevent someone who buys it from

9  using it."[35]

10     56.    As a direct and proximate result of the Data Breach, Plaintiff and the

11  Class have been damaged and have been placed at an imminent, immediate, and

12  continuing increased risk of harm from continued fraud and identity theft. Plaintiff

13  and the Class must now take the time and effort to mitigate the actual and potential

14  impact of the Data Breach on their everyday lives, including placing "freezes" and

15  "alerts" with credit reporting agencies, contacting their financial institutions, closing

16  or modifying financial accounts, and closely reviewing and monitoring bank

17  accounts and credit reports for unauthorized activity for years to come.

18     57.    Even more seriously is the identity restoration that Plaintiff and other

19  Class Members must go through, which can include spending countless hours filing

20  police reports, filling out IRS forms, Federal Trade Commission checklists,

21  Department of Motor Vehicle driver's license replacement applications, and calling

22

23  [33] *See, e.g.*, Kayleigh Kulp, *Credit Monitoring Services May Not Be Worth the Cost*,
24  CNBC (Nov. 30, 2017, 9:00 AM), https://www.cnbc.com/2017/11/29/credit-monitoring-services-may-not-be-worth-the-cost.html.

25  [34] *Dark Web Monitoring: What You Should Know*, CONSUMER FEDERATION OF
26  AMERICA (Mar. 19, 2019), https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know.

27  [35] *Id.*

28                    CLASS ACTION COMPLAINT - 15

financial institutions to cancel fraudulent credit applications, to name just a few of the steps Plaintiff and the Class must take.

58.    Plaintiff and the Class have or will experience the following concrete and particularized harms for which they are entitled to compensation, including:

    a.    Actual identity theft;

    b.    Trespass, damage to, and theft of their personal property including Private Information;

    c.    Improper disclosure of their Private Information;

    d.    The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their Private Information being placed in the hands of criminals;

    e.    Loss of privacy suffered as a result of the Data Breach, including the harm of knowing cyber criminals have their Private Information;

    f.    Ascertainable losses in the form of time taken to respond to identity theft and attempt to restore identity, including lost opportunities and lost wages from uncompensated time off from work;

    g.    Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably expended to remedy or mitigate the effects of the Data Breach;

    h.    Ascertainable losses in the form of deprivation of the value of Plaintiff's and Class Members' Private Information for which there is a well-established and quantifiable national and international market;

    i.    The loss of use of and access to their credit, accounts, and/or funds;

    j.    Damage to their credit due to fraudulent use of their Private Information; and/or

    k.    Increased cost of borrowing, insurance, deposits, and the inability to

CLASS ACTION COMPLAINT - 16

secure more favorable interest rates because of a reduced credit score.

59.    Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which remains in the possession of Defendant, is protected from further breaches by the implementation of industry standard security measures and safeguards. Defendant has shown itself wholly incapable of protecting Plaintiff's and the Class's Private Information.

60.    Plaintiff and Class Members also have an interest in ensuring that their Private Information that was provided to Tea is removed from all of Tea's servers, email systems, and files.

61.    Given the kind of Private Information Tea made accessible to hackers, however, Plaintiff is certain to incur additional damages. Because identity thieves have their Private Information, Plaintiff and all Class Members will need to have identity theft monitoring protection for the rest of their lives. Some may even need to go through the long and arduous process of getting a new Social Security number, with all the loss of credit and employment difficulties that come with a new number.[36]

62.    None of this should have happened because the Data Breach was entirely preventable.

**C. Defendant was Aware of the Risk of Cyberattacks.**

63.    Data security breaches have dominated the headlines for the last two decades. And it doesn't take an IT industry expert to know it. The general public can

---

[36] *What happens if I change my Social Security number*, LEXINGTON LAW (Aug. 10, 2022),    https://www.lexingtonlaw.com/blog/credit-101/will-a-new-social-security-number-affect-your-credit.html.

tell you the names of some of the biggest cybersecurity breaches: Target,[37] Yahoo,[38] Marriott International,[39] Chipotle, Chili's, Arby's,[40] and others.[41]

64.     Data breaches have been on the rise for a number of years, and this trend is not slowing down.

65.     Tea should certainly have been aware, and indeed was aware, that it was at risk of a data breach that could expose the Private Information that it collected and maintained.

66.     Tea was clearly aware of the risks it was taking and the harm that could result from inadequate data security.

**D. Tea Could Have Prevented the Data Breaches.**

67.     Data breaches are preventable.[42] As Lucy Thompson wrote in the DATA BREACH AND ENCRYPTION HANDBOOK, "In almost all cases, the data breaches that

---

[37] Michael Kassner, *Anatomy of the Target Data Breach: Missed Opportunities and Lessons Learned*, ZDNET (Feb. 2, 2015), https://www.zdnet.com/article/anatomy-of-the-target-data-breach-missed-opportunities-and-lessons-learned/.

[38] Martyn Williams, *Inside the Russian Hack of Yahoo: How They Did It*, CSOONLINE.COM (Oct. 4, 2017), https://www.csoonline.com/article/3180762/inside-the-russian-hack-of-yahoo-how-they-did-it.html.

[39] Patrick Nohe, *The Marriot Data Breach: Full Autopsy*, THE SSL STORE: HASHEDOUT (Mar. 22, 2019), https://www.thesslstore.com/blog/autopsying-the-marriott-data-breach-this-is-why-insurance-matters/.

[40] Alfred Ng, *FBI Nabs Alleged Hackers in Theft of 15M Credit Cards from Chipotle, Others*, CNET (Aug. 1, 2018, 12:58 PM), https://www.cnet.com/news/fbi-nabs-alleged-hackers-in-theft-of-15m-credit-cards-from-chipotle-others/?ftag=CMG-01-10aaa1b.

[41] *See, e.g.*, Michael Hill and Dan Swinhoe, *The 15 Biggest Data Breaches of the 21st Century*, CSO ONLINE (Nov. 8, 2022), https://www.csoonline.com/article/2130877/the-biggest-data-breaches-of-the-21st-century.html.

[42] Lucy L. Thomson, "Despite the Alarming Trends, Data Breaches Are Preventable," *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012), available at https://lawcat.berkeley.edu/record/394088.

CLASS ACTION COMPLAINT - 18

occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[43] she added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[44]

68.    "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures. . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a *data breach never occurs*."[45]

69.    In Data Breaches like these, many failures laid the groundwork for the Breach.

70.    The FTC has published guidelines that establish reasonable data security practices for businesses.

71.    The FTC guidelines emphasize the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.[46]

72.    The FTC guidelines establish that businesses should protect the confidential information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies for installing vendor-approved patches to correct security problems.

---

[43]*Id.* at 17.
[44]*Id.* at 28.
[45]*Id.*
[46]  *Protecting Personal Information: A Guide for Business*, FTC, available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

73.    The FTC guidelines also recommend that businesses utilize an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating hacking attempts; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

74.    According to information and belief, Tea failed to maintain many reasonable and necessary industry standards necessary to prevent a data breach, including the FTC's guidelines.

75.    Upon information and belief, Tea also failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework, NIST Special Publications 800-53, 53A, or 800-171; the Federal Risk and Authorization Management Program (FEDRAMP); or the Center for Internet Security's Critical Security Controls (CIS CSC), which are well respected authorities in reasonable cybersecurity readiness.

76.    As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[47]

77.    Defendant could and should have implemented, as recommended by the Federal Bureau of Investigation, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like

---

[47] *See* How to Protect Your Networks from RANSOMWARE, at 3, available at https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.

Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet

CLASS ACTION COMPLAINT - 21

browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[48]

78.    Further, Defendant could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer**. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks….

- **Use caution with links and when entering website addresses**. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website

---

[48] *Id.* at 3–4.

addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net)….

- **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe**. Check a website's security to ensure the information you submit is encrypted before you provide it….

- **Verify email senders**. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself**. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them

updated—to reduce malicious network traffic….[49]

79.    In addition, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

- **Secure internet-facing assets**
    - Apply latest security updates
    - Use threat and vulnerability management
    - Perform regular audit; remove privileged credentials
- **Thoroughly investigate and remediate alerts**
    - Prioritize and treat commodity malware infections as potential full compromise;
- **Include IT Pros in security discussions**
    - Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;
- **Build credential hygiene**
    - Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords
- **Apply principle of least-privilege**
    - Monitor for adversarial activities
    - Hunt for brute force attempts
    - Monitor for cleanup of Event Logs

---

[49] *See* Security Tip (ST19-001) Protecting Against Ransomware (original release date Apr. 11, 2019), available at https://www.cisa.gov/news-events/news/protecting-against-ransomware.

CLASS ACTION COMPLAINT - 24

- Analyze logon events

- **Harden infrastructure**

  - Use Windows Defender Firewall

  - Enable tamper protection

  - Enable cloud-delivered protection

  - Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[50]

80.    Given that Defendant was storing the Private Information of millions of individuals, Defendant could have and should have implemented all of the above measures to prevent and detect cyberattacks.

81.    Specifically, among other failures, Tea had far too much confidential unencrypted information held on its systems. Such Private Information should have been segregated into an encrypted system.[51]

82.    Moreover, it is well-established industry standard practice for a business to dispose of confidential Private Information once it is no longer needed.

83.    The FTC, among others, has repeatedly emphasized the importance of disposing unnecessary Private Information, saying simply: "Keep sensitive data in your system only as long as you have a business reason to have it. Once that business need is over, properly dispose of it.  If it's not on your system, it can't be stolen by

---

[50] *See* Human-operated ransomware attacks: A preventable disaster (Mar. 5, 2020), *available at* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/.

[51] *See, e.g.,* Adnan Raja, *How to Safeguard Your Business Data with Encryption*, FORTRA (Aug. 14, 2018), https://digitalguardian.com/blog/how-safeguard-your-business-data-encryption.

hackers."[52]   Tea, rather than following this basic standard of care, kept thousands of individuals' unencrypted Private Information indefinitely.

84.    In sum, the Breach could have readily been prevented through the use of industry standard network segmentation and encryption of all Private Information.

85.    Further, the scope of the Breach could have been dramatically reduced had Tea utilized proper record retention and destruction practices.

**E. Plaintiff's Individual Experience**

***Plaintiff Celeste Jones***

86.    Plaintiff Jones used Tea's mobile application and was a registered user prior to February 2024. Upon information and belief, Plaintiff Jones's Private Information was compromised in the Data Breach.

87.    Upon information and belief, Defendant was in possession of Plaintiff's Private Information before, during, and after the Data Breach.

88.    Because of the Data Breach, there is no doubt Plaintiff Jones's highly confidential Private Information is in the hands of cybercriminals. The *modus operandi* of cybercriminals involves stealing Private Information for financial gain. Cybercriminals may use stolen identities to conceal their own true identity or carry out a range of fraudulent activities, from credit card fraud to impersonation. As such, Plaintiff Jones and the Class are at an imminent risk of identity theft and fraud.

89.    As a result of the Data Breach, Plaintiff Jones has already expended hours of her time and has suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach. This includes: (i) investigating the Data Breach; (ii) investigating how best

---

[52] *Protecting Personal Information: A Guide for Business*, FTC,  *available at* https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf, at p. 6.

to ensure that she is protected from the ramifications of the Data Breach; and/or (iii) reviewing her account statements, credit reports, and/or other information.

90.    Plaintiff Jones places significant value in the security of her Private Information and does not readily disclose it. Plaintiff Jones has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source.

91.    Plaintiff Jones has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. Such a risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Private Information compromised by the Data Breach.

92.    Knowing that thieves intentionally targeted and stole her Private Information and knowing that her Private Information is in the hands of cybercriminals has caused Plaintiff Jones great anxiety beyond mere worry.

93.    Plaintiff Jones has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff's and the Class's Private Information will be wholly unprotected and at-risk of future data breaches.

94.    Plaintiff Jones has suffered injuries directly and proximately caused by the Data Breach, including: (i) theft of her valuable Private Information; (ii) the imminent and certain impending injury flowing from anticipated fraud and identity theft posed by her Private Information being placed in the hands of cybercriminals; (iii) damages to and diminution in value of her Private Information that was entrusted to Defendant with the understanding that Defendant would safeguard this information against disclosure; (iv) loss of the benefit of the bargain with Defendant to provide adequate and reasonable data security—*i.e.*, the difference in value

between what Plaintiff Jones should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security and failing to protect her Private Information; and (v) continued risk to her Private Information, which remains in the possession of Defendant and which is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information that was entrusted to Defendant.

### V. CLASS ACTION ALLEGATIONS

95.    Plaintiff incorporates by reference all preceding paragraphs as if fully restated here.

96.    Plaintiff brings this action against Tea on behalf of herself, and all other individuals similarly situated under Federal Rule of Civil Procedure 23. Plaintiff asserts all claims on behalf of a nationwide class (the "Class") defined as follows:

> **All persons whose Private Information was accessed and/or acquired in the Data Breach.**

97.    Excluded from the Class are Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and members of their immediate families and judicial staff.

98.    Plaintiff reserves the right to amend the above definition or to propose subclasses in subsequent pleadings and motions for class certification.

99.    Plaintiff anticipates the issuance of notice setting forth the subject and nature of the instant action to the proposed Class. Upon information and belief, Defendant's own business records or electronic media can be utilized for the notice process.

100.    The proposed Class meets the requirements of Federal Rule of Civil Procedure 23.

101.    **Numerosity:** The proposed Class is so numerous that joinder of all members is impracticable.

102.    **Typicality:** Plaintiff's claims are typical of the claims of the Class. Plaintiff and all members of the Class were injured through Tea's uniform misconduct. Tea's inadequate data security gave rise to Plaintiff's claims and are identical to those that give rise to the claims of every other Class member because Plaintiff and each member of the Class had their sensitive Private Information compromised in the same way by the same conduct of Tea.

103.    **Adequacy:** Plaintiff is an adequate representative of the Class because Plaintiff's interests do not conflict with the interests of the Class; Plaintiff has retained counsel competent and highly experienced in data breach class action litigation; and Plaintiff and Plaintiff's counsel intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and their counsel.

104.    **Superiority:** A class action is superior to other available means of fair and efficient adjudication of the claims of Plaintiff and the Class. The injury suffered by each individual class member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult if not impossible for members of the Class individually to effectively redress Tea's wrongdoing. Even if Class members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far

fewer management difficulties and provides benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

105. **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include:

    a. Whether Defendant engaged in the wrongful conduct alleged herein;

    b. Whether Defendant failed to adequately safeguard Plaintiff's and the Class's Private Information;

    c. Whether Defendant owed a duty to Plaintiff and the Class to adequately protect their Private Information, and whether it breached this duty;

    d. Whether Tea breached its duties to Plaintiff and the Class;

    e. Whether Tea failed to provide adequate cyber security;

    f. Whether Tea knew or should have known that its computer and network security systems were vulnerable to cyberattacks;

    g. Whether Tea's conduct, including its failure to act, resulted in or was the proximate cause of the breach of its company network;

    h. Whether Tea was negligent in permitting unencrypted Private Information off vast numbers of individuals to be stored within its network;

    i. Whether Tea was negligent in failing to adhere to reasonable retention policies, thereby greatly increasing the size of the Data Breaches to include former employees and business associates;

    j. Whether Tea breached implied contractual duties to Plaintiff and the Class to use reasonable care in protecting their Private Information;

CLASS ACTION COMPLAINT - 30

k.  Whether Tea failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiff and the Class;

l.  Whether Tea continues to breach duties to Plaintiff and the Class;

m.  Whether Plaintiff and the Class suffered injury as a proximate result of Tea's negligent actions or failures to act;

n.  Whether Plaintiff and the Class are entitled to recover damages, equitable relief, and other relief; and

o.  Whether Tea's actions alleged herein constitute gross negligence, and whether Plaintiff and Class Members are entitled to punitive damages.

## I.      CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## NEGLIGENCE

## (On Behalf of Plaintiff and the Class)

106.  Plaintiff incorporates paragraphs 1–105 as though fully set forth herein.

107.  Tea solicited, gathered, and stored the Private Information of Plaintiff and Class Members.

108.  Upon accepting and storing the Private Information of Plaintiff and Class members on its computer systems and networks, Defendant undertook and owed a duty to Plaintiff and Class members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information of Plaintiff and the Class from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

109.  Defendant had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and Class members could and would

suffer if the Private Information was wrongfully disclosed. Plaintiff and Class members were the foreseeable victims of any inadequate safety and security practices. Plaintiff and the Class members had no ability to protect their Private Information that was in Defendant's possession. As such, a special relationship existed between Defendant and Plaintiff and the Class.

110. Because of this special relationship, Defendant required Plaintiff and Class members to provide their Private Information, including names, Social Security numbers, and other Private Information.

111. Implied in these exchanges was a promise by Defendant to ensure that the Private Information of Plaintiff and Class members in its possession was only used for the provided purpose and that Defendant would destroy any Private Information that it was not required to maintain.

112. As part of this special relationship, Defendant had a duty to perform with skill, care, and reasonable expedience and faithfulness.

113. Through Defendant's acts and omissions, including Defendant's failure to provide adequate data security, its failure to protect Plaintiff's and Class members' Private Information from being foreseeably accessed, and its improper retention of Private Information it was not required to maintain, Defendant negligently failed to observe and perform its duty.

114. Plaintiff and Class members did not receive the benefit of the bargain with Defendant, because providing their Private Information was in exchange for Defendant's implied agreement to secure and keep it safe and to delete it once no longer required.

115. Defendant was aware of the fact that cybercriminals routinely target large corporations through cyberattacks in an attempt to steal customers' Private

Information. In other words, Defendant knew of a foreseeable risk to its data security systems but failed to implement reasonable security measures.

116.    Defendant owed Plaintiff and the Class members a common law duty to use reasonable care to avoid causing foreseeable risk of harm to Plaintiff and the Class when obtaining, storing, using, and managing personal information, including taking action to reasonably safeguard or delete such data and providing notification to Plaintiff and the Class members of any breach in a timely manner so that appropriate action could be taken to minimize losses.

117.    Defendant's duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B.

118.    Defendant had duties to protect and safeguard the Private Information of Plaintiff and the Class from being vulnerable to cyberattacks by taking common-sense precautions when dealing with sensitive Private Information. Additional duties that Defendant owed Plaintiff, and the Class include:

a.    To exercise reasonable care in designing, implementing, maintaining, monitoring, and testing Defendant's networks, systems, protocols, policies, procedures, and practices to ensure that Plaintiff's and Class members' Private Information was adequately secured from impermissible release, disclosure, and publication;

b.    To protect Plaintiff's and Class members' Private Information in its possession by using reasonable and adequate security procedures and systems;

c.  To implement processes to quickly detect a data breach, security incident, or intrusion involving its networks and servers; and

d.  To promptly notify Plaintiff and Class members of any data breach, security incident, or intrusion that affected or may have affected their Private Information.

119.   Plaintiff and the Class were the intended beneficiaries of Defendant's duties, creating a special relationship between them and Defendant. Defendant was in a position to ensure that its systems were sufficient to protect the Private Information that Plaintiff and the Class had entrusted to it.

120.   Plaintiff's injuries and damages, as described herein, are a reasonably certain consequence of Defendant's negligence and breach of its duties.

121.   Defendant breached its duties of care by failing to adequately protect Plaintiff's and Class members' Private Information. Defendant breached its duties by, among other things:

a.  Failing to exercise reasonable care in obtaining, retaining securing, safeguarding, and protecting the Private Information in its possession;

b.  Failing to protect the Private Information in its possession using reasonable and adequate security procedures and systems;

c.  Failing to consistently enforce security policies aimed at protecting Plaintiff and the Class's Private Information;

d.  Failing to implement processes to quickly detect data breaches, security incidents, or intrusions;

e.  Failing to promptly notify Plaintiff and Class members of the Data Breaches that affected their Private Information.

122.   Defendant's willful failure to abide by these duties was wrongful, reckless, and grossly negligent considering the foreseeable risks and known threats.

123.  As a direct and proximate result of Defendant's negligent conduct, including but not limited to its failure to implement and maintain reasonable data security practices and procedures as described above, Plaintiff and the Class have suffered damages and are at imminent risk of additional harms and damages (as alleged above).

124.  Through Defendant's acts and omissions described herein, including but not limited to Defendant's failure to protect the Private Information of Plaintiff and Class members from being stolen and misused, Defendant unlawfully breached its duty to use reasonable care to adequately protect and secure the Private Information of Plaintiff and Class members while it was within Defendant's possession and control.

125.  Further, through its failure to provide timely and clear notification of the Data Breach to Plaintiff and Class members, Defendant prevented Plaintiff and Class members from taking meaningful, proactive steps to securing their Private Information and mitigating damages.

126.  Plaintiff and Class members could have taken actions earlier had they been timely notified of the Data Breach, rather than months after it occurred.

127.  Plaintiff and Class members could have enrolled in credit monitoring, could have instituted credit freezes, and could have changed their passwords, among other things, had they been alerted to the Data Breach more quickly.

128.  Plaintiff and Class members have suffered harm from the delay in notifying them of the Data Breach.

129.  As a direct and proximate cause of Defendant's conduct, including but not limited to its failure to implement and maintain reasonable security practices and procedures, Plaintiff and Class members have suffered, as Plaintiff have, and/or will suffer injury and damages, including but not limited to: (i) the loss of the opportunity

to determine for themselves how their Private Information is used; (ii) the publication and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information, including the need for substantial credit monitoring and identity protection services for an extended period of time; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breaches, including but not limited to efforts spent researching how to prevent, detect, contest and recover from tax fraud and identity theft; (v) costs associated with placing freezes on credit reports and password protections; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information of employees in its continued possession; and, (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised Private Information for the rest of their lives. Thus, Plaintiff and the Class are entitled to damages in an amount to be proven at trial.

130.   The damages Plaintiff and the Class have suffered (as alleged above) and will suffer were and are the direct and proximate result of Defendant's negligent conduct.

131.   Plaintiff and the Class have suffered injury and are entitled to actual and punitive damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### NEGLIGENCE *PER SE*
### <u>(On Behalf of Plaintiff and the Class)</u>

132.  Plaintiff incorporates paragraphs 1–105 as though fully set forth herein.

133.  Pursuant to the FTC Act, 15 U.S.C. § 45(a), Defendant had a duty to Plaintiff and the Class to provide fair and adequate computer systems and data security to safeguard the Private Information of Plaintiff and the Class.

134.  The FTC Act prohibits "unfair practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also formed part of the basis of Defendant's duty in this regard.

135.  Defendant gathered and stored the Private Information of Plaintiff and the Class as part of its business which affects commerce.

136.  Defendant violated the FTC Act by failing to use reasonable measures to protect the Private Information of Plaintiff and the Class and by not complying with applicable industry standards, as described herein.

137.  Defendant breached its duties to Plaintiff and the Class under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and/or data security practices to safeguard Plaintiff's and Class members' Private Information, and by failing to provide prompt notice without reasonable delay.

138.  Defendant's multiple failures to comply with applicable laws and regulations constitutes negligence *per se*.

139.  Plaintiff and the Class are within the class of persons that the FTC Act was intended to protect.

140.  The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against.

141.    Defendant breached its duties to Plaintiff and the Class under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and the Class's Private Information.

142.    Defendant breached its duties to Plaintiff and the Class by unreasonably delaying and failing to provide notice of the Data Breach expeditiously and/or as soon as practicable to Plaintiff and the Class.

143.    Defendant's violations of the FTC Act constitute negligence *per se*.

144.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and the Class have suffered, and continue to suffer, damages arising from the Data Breaches, as alleged above.

145.    The injury and harm that Plaintiff and Class members suffered (as alleged above) was the direct and proximate result of Defendant's negligence *per se*.

146.    Plaintiff and the Class have suffered injury and are entitled to damages in amounts to be proven at trial.

## THIRD CAUSE OF ACTION
## BREACH OF IMPLIED CONTRACT
## (On Behalf of Plaintiff and the Class)

147.    Plaintiff incorporates paragraphs 1–105 as though fully set forth herein.

148.    Plaintiff and Class Members were required to deliver their Private Information to Defendant to use the Tea mobile application.

149.    Defendant solicited, offered, and invited Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

150. Defendant accepted possession of Plaintiff's and Class Members' Private Information for the purpose of providing services to Plaintiff and Class Members.

151. Plaintiff and the Class entrusted their Private Information to Defendant. In so doing, Plaintiff and the Class entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached and compromised or stolen.

152. In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations (including FTC guidelines on data security) and were consistent with industry standards.

153. Implicit in the agreement between Plaintiff and Class Members and the Defendant to provide Private Information, was the latter's obligation to: (a) use such Private Information for business purposes only, (b) take reasonable steps to safeguard that Private Information, (c) prevent unauthorized disclosures of the Private Information, (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Private Information, (e) reasonably safeguard and protect the Private Information of Plaintiff and Class Members from unauthorized disclosure or uses, (f) retain the Private Information only under conditions that kept such information secure and confidential.

154. The mutual understanding and intent of Plaintiff and Class Members on the one hand, and Defendant, on the other, is demonstrated by their conduct and course of dealing.

155.   On information and belief, at all relevant times Defendant promulgated, adopted, and implemented written privacy policies whereby it expressly promised Plaintiff and Class Members that it would only disclose Private Information under certain circumstances, none of which relate to the Data Breach.

156.   On information and belief, Defendant further promised to comply with industry standards and to make sure that Plaintiff's and Class Members' Private Information would remain protected.

157.   Plaintiff and Class Members paid money to Defendant with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

158.   Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

159.   Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of their implied promise to monitor their computer systems and networks to ensure that it adopted reasonable data security measures.

160.   Every contract in this State has an implied covenant of good faith and fair dealing, which is an independent duty and may be breached even when there is no breach of a contract's actual and/or express terms.

161.   Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

162.   Defendant breached the implied contracts it made with Plaintiff and the Class by failing to safeguard and protect their personal information, by failing to delete the information of Plaintiff and the Class once the relationship ended, and by

failing to provide accurate notice to them that personal information was compromised as a result of the Data Breach.

163.    Defendant breached the implied covenant of good faith and fair dealing by failing to maintain adequate computer systems and data security practices to safeguard Private Information, failing to timely and accurately disclose the Data Breach to Plaintiff and Class Members and continued acceptance of Private Information and storage of other personal information after Defendant knew, or should have known, of the security vulnerabilities of the systems that were exploited in the Data Breach.

164.    As a direct and proximate result of Defendant's breach of the implied contracts, Plaintiff and Class Members sustained damages, including, but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails; (viii) statutory damages; (ix) nominal damages; and (x) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

165. Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

166.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

### FOURTH CAUSE OF ACTION
### UNJUST ENRICHMENT
### (On Behalf of Plaintiff and the Class)

167.    Plaintiff incorporates paragraphs 1–105 as though fully set forth herein.

168.    Plaintiff alleges this claim in the alternative to her breach of implied contract claim.

169.    Defendant knew that Plaintiff and Class Members conferred a benefit upon it and accepted and retained that benefit by accepting and retaining the Private Information entrusted to it. Defendant profited from Plaintiff's retained data and commercialized and used Plaintiff's and Class Members' Private Information for business purposes.

170.    Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including payments on behalf of or for the benefit of Plaintiff and Class Members.

171.    As such, a portion of the payments made for the benefit of or on behalf of Plaintiff and Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

172.    Defendant failed to secure Plaintiff's and Class Members' Private Information and, therefore, did not fully compensate Plaintiff or Class Members for the value that their Private Information provided.

173.    Defendant acquired the Private Information through inequitable means

as it failed to disclose the inadequate data security practices previously alleged. If Plaintiff and Class Members had known that Defendant would not fund adequate data security practices, procedures, and protocols to sufficiently monitor, supervise, and secure their Private Information, they would not have entrusted their Private Information to Defendant.

174. Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to increase its own profits at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to their own benefit. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security and the safety of their Private Information.

175. Plaintiff and Class Members have no adequate remedy at law.

176. Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon it.

177. As a direct and proximate result of Defendant's conduct, Plaintiff, and other Class Members, have suffered actual harm in the form of experiencing specific acts of fraudulent activity and other attempts of fraud that required Plaintiff' efforts to prevent from succeeding.

178. As a result of Defendant's wrongful conduct, as alleged above, Plaintiff and the Class are entitled to restitution and disgorgement of profits, benefits, and other compensation obtained by Defendant and all other relief allowed by law.

## FIFTH CAUSE OF ACTION
## DECLARATORY AND INJUNCTIVE RELIEF
### (On Behalf of Plaintiff and the Class)

179. Plaintiff incorporates paragraphs 1–105 as though fully set forth herein.

180. This count is brought under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

181. As previously alleged, Plaintiff and members of the Class are entered into implied contracts with Defendant, which contracts required Defendant to provide adequate security for the Private Information collected from Plaintiff and the Class.

182. Defendant owed and still owes a duty of care to Plaintiff and Class members that require it to adequately secure Plaintiff's and Class members' Private Information.

183. Upon reason and belief, Defendant still possesses the Private Information of Plaintiff and the Class members.

184. Defendant has not satisfied its contractual obligations and legal duties to Plaintiff and the Class members.

185. Since the Data Breach, Defendant has not yet announced any changes to its data security infrastructure, processes, or procedures to fix the vulnerabilities in its computer systems and/or security practices which permitted the Data Breach to occur and go undetected and, thereby, prevent further attacks.

186. Defendant has not satisfied its contractual obligations and legal duties to Plaintiff and the Class. In fact, now that Defendant's insufficient data security is known to hackers, the Private Information in Defendant's possession is even more vulnerable to cyberattack.

187. Actual harm has arisen in the wake of the Data Breach regarding Defendant's contractual obligations and duties of care to provide security measures

CLASS ACTION COMPLAINT - 44

to Plaintiff and the members of the Class. Further, Plaintiff and the members of the Class are at risk of additional or further harm due to the exposure of their Private Information and Defendant's failure to address the security failings that led to such exposure.

188.   There is no reason to believe that Defendant's security measures are any more adequate now than they were before the Data Breaches to meet Defendant's contractual obligations and legal duties.

189.   Plaintiff and the Class, therefore, seek a declaration (1) that Defendant's existing security measures do not comply with its contractual obligations and duties of care to provide adequate security, and (2) that to comply with its contractual obligations and duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to:

    a.  Ordering that Defendant engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

    b.  Ordering that Defendant engage third-party security auditors and internal personnel to run automated security monitoring;

    c.  Ordering that Defendant audit, test, and train its security personnel regarding any new or modified procedures;

    d.  Ordering that Defendant segment employee data by, among other things, creating firewalls and access controls so that if one area of Defendant's systems is compromised, hackers cannot gain access to other portions of Defendant's systems;

e.  Ordering that Defendant purge, delete, and destroy, in a reasonably secure manner, customer data not necessary for their provisions of services;

f.  Ordering that Defendant conduct regular database scanning and security checks; and

g.  Ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

## VI.  **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the Class pray for judgment against Defendant as follows:

a.  An order certifying this action as a class action under Federal Rule of Civil Procedure 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiff are proper representatives of the Class requested herein;

b.  A judgment in favor of Plaintiff and the Class awarding them appropriate monetary relief, including compensatory damages, punitive damages, attorney fees, expenses, costs, and such other and further relief as is just and proper;

c.  An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

d.  An order requiring Defendant to pay the costs involved in notifying the Class Members about the judgment and administering the claims process;

e.  A judgment in favor of Plaintiff and the Class awarding them pre-judgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

f.  An award of such other and further relief as this Court may deem just and proper.

## II.    **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all appropriate issues raised in this Class Action Complaint.

Dated:  July 30, 2025                    Respectfully submitted,

*/s/: John J. Nelson*
John J. Nelson (SBN 317598)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
280 S. Beverly Drive-Penthouse Suite
Beverly Hills, CA 90212
Telephone: (858) 209-6941
Email: jnelson@milberg.com

Kennedy M. Brian
(*pro hac vice application forthcoming*)
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Ave.
Oklahoma City, OK 73120
Telephone: (405) 235-1560
Fax: (405) 239-2112
Email: kpb@federmanlaw.com

*Attorneys for Plaintiff and Proposed Class*

CLASS ACTION COMPLAINT - 47